IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| VALORIE AFFANDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0398-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Valorie Affandi seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding plaintiff not credible, (2) giving greater weight to the opinion of Dr. Cowles than Dr. Sheehan, and (3) relying on improper vocational expert testimony. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On March 25, 2010, plaintiff applied for disability benefits alleging that she had been disabled since February 9, 2010. Plaintiff's disability stems from paranoia, chronic obstructive pulmonary disease ("COPD"), torn cartilage in her knee, depression, anxiety disorder, and high blood pressure. Plaintiff's application was denied initially. On February 8, 2012, a hearing was held before an Administrative Law Judge. On March 28, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On February 21, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

*II.*    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

*III.*    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff;  orthopedic surgeon Robert Campbell Thompson, M.D.; neuropsychologist Richard Scott Cowles, Ph.D.; and Sugi Y. Komarov, a vocational expert, in addition to documentary evidence admitted at the hearing and presented to the Appeals Council.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1975 through 2011, shown in actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1975 | $ 1,217.46 | $ 5,830.63 |
| 1976 | 763.40 | 3,420.06 |
| 1977 | 1,281.37 | 5,415.99 |
| 1978 | 540.70 | 2,117.26 |
| 1979 | 1,568.97 | 5,649.51 |
| 1980 | 387.00 | 1,278.35 |
| 1981 | 0.00 | 0.00 |
| 1982 | 3,068.68 | 8,728.98 |
| 1983 | 363.42 | 985.74 |
| 1984 | 2,433.38 | 6,233.86 |
| 1985 | 5,771.11 | 14,180.32 |
| 1986 | 15.00 | 35.79 |
| 1987 | 956.57 | 2,145.81 |
| 1988 | 1,027.00 | 2,195.86 |
| 1989 | 492.00 | 1,011.80 |
| 1990 | 0.00 | 0.00 |
| 1991 | 0.00 | 0.00 |
| 1992 | 889.31 | 1,602.74 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 203.14 | 306.16 |
| 1998 | 9,722.29 | 13,924.13 |
| 1999 | 14,563.96 | 19,757.27 |

| | | |
|------|-----------|-----------|
| 2000 | 22,438.01 | 28,844.03 |
| 2001 | 23,324.40 | 29,284.85 |
| 2002 | 9,738.13 | 12,105.26 |
| 2003 | 11,173.57 | 13,558.19 |
| 2004 | 9,373.39 | 10,868.57 |
| 2005 | 16,063.08 | 17,967.91 |
| 2006 | 14,476.90 | 15,482.03 |
| 2007 | 3,278.00 | 3,353.41 |
| 2008 | 4,057.20 | 4,057.20 |
| 2009 | 0.00 | 0.00 |
| 2010 | 360.00 | 360.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |

(Tr. at 176, 190, 198).

## Disability Report - Field Office

On March 25, 2010, S. Allen met face to face with plaintiff and observed that she had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, writing, using her hands, or coherency (Tr. at 200-201).

## Disability Report - Adult

In a Disability Report, plaintiff indicated that she can read and write English, that she weighed 250 pounds, that she completed 12th grade in 1980 but has no specialized job training, trade or vocational school, and that her medications for her mental impairment consisted of Cymbalta (antidepressant) and Valium (anti-anxiety) (Tr. at 203-214).

## Function Report - Adult

In a Function Report dated April 1, 2010, plaintiff stated that she watches a lot of television (Tr. at 215-222). Others come to visit her a lot, but she does not have a social life outside of her family. Her impairments affect her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions and get along with others. She has no difficulty using her hands, talking or hearing. She can only walk 4 or 5 feet. She does not follow written instructions. As for spoken instructions, "If

it is plain and simple, I don't need redirection.  But if I have to figure it out I get help."  She uses a brace on her knee, and she uses a cane.

**B.      SUMMARY OF MEDICAL RECORDS**

On August 18, 2008, plaintiff's sixth application for supplemental security income and third application for a period of disability and disability insurance benefits were denied initially.  This was the case prior to the one currently before me.

On October 16, 2008, plaintiff saw James True, M.D., at Swope Health Services Behavioral (Tr. at 307).  Plaintiff said, "I am miserable, but the medicine helps I guess."  Dr. True made the following observations:  "She is looking for a job, but cannot find one. The jobs are tight now.  In addition, she has sort of hooked up with a man who expects her to work, get things done, expects him not to work at all, lazes around and then complains that she is angry for wanting him to put out the trash, do some work, etc. . . .  There is no SI [suicidal ideation] involved."  Under mental status exam, Dr. True noted that plaintiff was "mildly anxious."  He prescribed Klonopin (treats anxiety) and Cymbalta (antidepressant).

On April 27, 2009, plaintiff saw a nurse practitioner at Swope Health for medication refills (Tr. at 293-294).  Plaintiff weighed 264 pounds and her blood pressure was 146/80.  She reported neck pain which she rated a 7 out of 10 in severity.  She was assessed with hypertension, asthma and obesity.  Hydrochlorothiazide was prescribed for hypertension, and samples of Advair were provided to treat plaintiff's asthma.  No pain medication was prescribed.  Plaintiff was told to diet and exercise.

On July 16, 2009, plaintiff was treated at Swope Health reporting that she had been out of her blood pressure medication for two weeks (Tr. at 291-292).  She was experiencing chest pain, anxiety, dizziness and syncope.  She reported sleeping 6 to 7 hours per night.  Her physical exam was entirely normal including her neck and extremities.  She was assessed with

hypertension and history of asthma.  She was prescribed Maxzide (treats hypertension),

Cymbalta (antidepressant), Loratadine (antihistamine), Albuterol (for asthma) and Advair (for

asthma).

On July 20, 2009, plaintiff saw Dr. True (Tr. at 290).

SUBJECTIVE:  "Looking for work."

OBJECTIVE:  The patient got her degree and is looking hard for work, but cannot find
one in this economy, however, she is still proud of her degree which she should be
struggling to make it, lot of people say negative things and try to keep her down, but she
refuses to bend.

MENTAL STATUS EXAM:  She is well groomed, pleasant, goal directed in her speech,
euthymic and calm.

Dr. True assessed Bipolar I disorder, most recent episode (or current) mixed,

unspecified, with a GAF of "about 55".  He prescribed Cymbalta (antidepressant) and Klonopin

(treats anxiety).

On December 14, 2009, plaintiff saw Dr. True (Tr. at 289, 298).  Plaintiff said she was

awaiting her disability hearing.  "Still anxious and so depressed she can't work.  Still with

twisted knee.  Depressed or can't support self."  Plaintiff said Valium (treats anxiety) does not

work as well as Klonopin (treats anxiety).  She was still anxious.  Dr. True performed a mental

status exam and noted only that plaintiff was depressed and anxious with no psychosis.  He

assessed bipolar I disorder, most recent episode (or current) mixed, unspecified and anxiety

disorder not otherwise specified. Her GAF was 42.  He discontinued Valium and prescribed

Klonopin (which had actually been prescribed five months earlier), and he gave plaintiff

samples of Cymbalta (antidepressant).

On January 21, 2010, plaintiff saw Dr. True (Tr. at 287-288).  The records reflect that

plaintiff said she "never got medical records, and never got her degree."  She was depressed

over having no job, she said she could not work due to depression.  She had no suicidal ideation.

"Plans failed." She said she was fired from her job, then was "too depressed to go." Dr. True performed a mental status exam and observed that plaintiff was depressed and anxious with no psychosis. He assess bipolar I disorder and generalized anxiety disorder, and he noted a GAF of 42. "Weeping with decreased mood." He told plaintiff to stop taking Klonopin. It appears he prescribed Cymbalta and Valium. "Valium for money issues."

On February 8, 2010, plaintiff's sixth application for supplemental security income and fourth application for a period of disability and disability insurance benefits was denied by an ALJ.

The next day, February 9, 2010, is plaintiff's alleged onset date in the case before me.

On March 8, 2010, plaintiff saw Dr. True (Tr. at 286). "I lost my disability application hearing."

> OBJECTIVE: The patient said that the court told her they never received medical records. When she went to our medical records, they told her that I had not written any notes. I showed her in the chart the notes that I indeed had written plus other people. She will go back to her attorney and try to obtain these notes again. She has no side effects from the medications. She likes the Cymbalta and gets it through Swope Care, but has to stay ahead of it. She said, she cannot sleep. When I told her I had given her medicine for sleep, especially the diazepam, she told me she had not been taking it, but agreed to do so. It works wonderfully for her for her sleep, but she does not want to get "addicted." We discussed this at some length.

> MENTAL STATUS EXAM: The patient is irritated, depressed and anxious. There is no overt psychosis. Today, she [has] no suicidal ideations. . . . She has no energy and reports that she is "menopausal."

Dr. True assessed Bipolar I disorder, most recent episode (or current) mixed, unspecified and anxiety disorder not otherwise specified. Her GAF was "about 42." He refilled her Cymbalta and Valium, which was prescribed for insomnia.

On March 16, 2010, plaintiff went to the emergency room at St. Luke's complaining of an exacerbation of her asthma and knee pain (Tr. at 310-320). She denied back pain or difficulty walking. Her physical exam was normal except for wheezing -- her back was

normal, extremities were normal, and her psychological examination was normal. X-rays of her knee and chest were taken. Her lungs were normal. Mild thoracic degenerative disc disease was noted. Moderately large right knee joint effusion (water on the knee) and degenerative joint disease were observed. She was assessed with asthma exacerbation due to upper respiratory infection, possible bronchitis. She was told to use an Ace bandage for her knee along with ice and over-the-counter Aleve. She was given an antibiotic and a prescription for Lortab and told to use her Albuterol inhaler.

Nine days later, on March 25, 2010, plaintiff applied for supplemental security income for the seventh time and a period of disability and disability insurance benefits for the fifth time, which is the case now before me.

On May 7, 2010, plaintiff saw Dr. True (Tr. at 400). She reported that she was "under too much stress, I cannot sleep." The objective section of this record reads as follows: "The patient states that her life is out of control basically because she thinks she is in an [sic] relationship that has spun out of control. In addition, she does not have much money. Bills come in and so forth. She denies suicidal ideation. She does not know if therapy can help, but eventually wishes to get therapy. I do not assess her as psychotic. There is no delusion or abnormality in her speech process or content, but she is certainly depressed, but not suicidal. She is also slightly anxious. She believes it is the med change we made from Klonopin to Valium was not good and wants to go back to the Klonopin. In addition, she is not sleeping and feels like the medicines have all plateaued." Dr. True assessed bipolar I disorder "by history" and generalized anxiety disorder. Her GAF was "about 48." Dr. True told plaintiff to continue Cymbalta, discontinue the Valium and substitute Klonopin, and he prescribed amitriptyline (antidepressant) for sleep. "I arranged short-term psychotherapy with the director of psychotherapy here at Mental Health Department."

On May 8, 2010, J. Edd Bucklew, Ph.D., a non-examining agency psychologist, reviewed plaintiff's file (Tr. at 323-334). Dr. Bucklew found that plaintiff has mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. "Based on the evidence as a whole, claimant may have problems at times performing more demanding tasks, and she would be limited for socially stressful or complex tasks, but she is otherwise able to remember, understand, and complete instructions with usual supervision."

On May 10, 2010, plaintiff underwent an initial assessment for psychotherapy at Swope Health (Tr. at 389-399). Plaintiff reported a lack of motivation to exercise and said she had gained about 40 pounds. "Client ruptured her knee and reports pain in standing. . . . Client states that she has been more depressed for the past few weeks. . . . Client states that she stays to herself more -- can not work outside the home. Trouble focusing -- feels like she is in a trance most of the time, hard to complete household chores [due to "lack of motivation or desire to participate in daily living activities"]. . . . Client reports a history of drug use and may have experienced some delusion as a result." Plaintiff reported a suicide attempt in 2006 by taking sleeping pills. Under employment history, plaintiff said she is not able to control her temper with adults -- "it has gotten worse." Plaintiff reported that she completed 12th grade. She reported having used cocaine daily from age 31 to age 34 (i.e., from about 1989 to 1992). She completed inpatient substance abuse treatment in 1993 and had been drug-free for the past 20 years. In a risk assessment, plaintiff reported "no current thoughts or history of attempts" of suicide. She checked the box for "ten or more minor instances" of violent behavior or "three or more serious instances" of violent behavior. She noted no impaired functioning or judgment and only "mild medical concerns." The social worker wrote, "Client reports no income with the exception of her son's SSI for the past three years." Plaintiff was assessed with bipolar

disorder and panic disorder with a GAF of 42.

On July 9, 2010, plaintiff went to the emergency room at St. Luke's complaining of shortness of breath (Tr. at 363-371). She was out of Albuterol. On exam, wheezes were heard. Her extremities were noted to be normal; her psychological exam was normal. EKG was normal. "Patient takes no medications." She was diagnosed with dyspnea (shortness of breath). Lorazepam (for anxiety) was administered through IV, and she was treated with Albuterol and Atrovent inhalers. Plaintiff indicated, "I feel so much better." She was discharged in stable condition with a prescription for an inhaler.

On August 9, 2010, plaintiff saw Dr. True (Tr. at 388). She said she was doing "okay." Plaintiff reported feeling much better due to her therapy. "She used to remain on her medicine and does pretty well, but has run out. . . . Basically, she denied having side effects from the medication and says that she sleeps well." Under Mental Status Exam, Dr. True wrote, "The patient is friendly with goal-directed speech, bright affect, and properly groomed without psychotic content to her speech. She appears almost euthymic today." He assessed bipolar I disorder and anxiety disorder not otherwise specified with a GAF of "about 45." He refilled her Klonopin (treats anxiety), Cymbalta (antidepressant), and Amitriptyline (antidepressant prescribed for sleep) and told her to return in six months.

On December 21, 2010, plaintiff went to the emergency room at Research Medical Center reporting "bilateral knee pain for years" (Tr. at 408-412). Plaintiff denied any trauma but reported her pain a 10 out of 10. Plaintiff's blood pressure was 133/78. The records do not reflect any tests or treatment, but plaintiff was discharged in good condition.

On December 27, 2010, plaintiff saw Dr. True (Tr. at 387). Plaintiff said, "still wants on SS disability." She said she was still depressed, could not tolerate being around people. Plaintiff denied suicidal ideation but said she had noted a need for increased Klonopin. On exam

plaintiff was noted to be pleasant with depressed mood and avoidant style/affect. She said she avoids people in order to avoid conflict. Plaintiff was assessed with bipolar I disorder and anxiety disorder not otherwise specified. He increased her dose of Klonopin and told her to stay in therapy and exercise.

On May 5, 2011, plaintiff was taken by ambulance to the emergency room at Research Medical Center due to head pain (Tr. at 416-433). She reported no history of headaches. Plaintiff was observed to be alert, fully oriented, cooperative and tearful. She reported her pain a 10 out of 10 in intensity and said it had started the day before. Her blood pressure was 165/74. A CT scan of the head was normal. She had an EKG and was assessed with bradycardia.[1] A CT scan of the cervical spine was done due to neck pain. Lee Graham, M.D., assessed mild central posterior C4-C5 disc protrusion and degenerative changes of C5-C6 disc. The records do not indicate what if any treatment was provided.

On May 23, 2011, plaintiff saw Dr. True and said she was worried (Tr. at 386). "Fears she has dementia, but clearly explains in detail how she sees it. . . . No money, lives off son, no car." Plaintiff was observed to be crying but she had no suicidal ideation, no psychosis. Her assessments remained the same with a GAF of 40. Dr. True decreased plaintiff's Klonopin and prescribed Namenda (treats dementia).

On June 1, 2011, plaintiff saw Milton Levin, M.D., at Swope Health indicating she was out of her medications (Tr. at 404-405). Plaintiff weighed 281 pounds, her blood pressure was 168/102. On exam no wheezing was heard. Her cervical spine was normal, thoracic spine was normal, lumbar spine was normal. She had painful and limited range of motion in her knee. She rated her pain an 8 out of 10 in severity. Her gait was normal, motor strength was

---

[1]Bradycardia is a slower than normal heart rate. The heart usually beats between 60 and 100 times a minute in an adult at rest. Bradycardia is assessed when the heart beats fewer than 60 times a minute.

normal. She was diagnosed with "osteoarthrosis, unspecified w/other generalized or localized, lower leg." He prescribed Naproxen (non-steroidal anti-inflammatory).

On August 9, 2011, plaintiff saw Jennifer Santiago, a nurse practitioner at Swope Health (Tr. at 402-403). Her blood pressure was elevated: "Diagnosed hypertensive many years ago, out of medication for a week." Plaintiff weighed 292 pounds, her blood pressure was 146/89, her pain scale was zero. She denied chests pain or shortness of breath. She was noted to be pleasant. She had no tenderness in her neck. She was assessed with "essential hypertension benign." Her hydrochlorothiazide was refilled.

At 9:00 a.m. on November 2, 2011, plaintiff saw Joseph Noland, M.D., an orthopedic specialist, in connection with her disability case (Tr. at 346-354). Plaintiff reported knee pain for the past two years. "She denies any locking, catching or feeling of instability." Plaintiff was taking only Cymbalta (antidepressant) and Klonopin (treats anxiety). "Denies tobacco use positive for alcohol use." Plaintiff had full range of motion of both knees but was tender to palpation. Her gait was "normal and stable, non-antalgic." Plaintiff was full weight bearing, able to ambulate in a straight line, able to climb onto the examination table without assistance. She was unable to squat and rise without assistance. "Based on the above information, in my opinion sitting would be without limitations. Standing would be with limitations. Walking would be with limitations. Lifting would be without limitations. Carrying would be without limitations. Handling objects would be with limitations."

Dr. Noland found that plaintiff could lift and carry up to 100 pounds continuously, sit for 8 hours per day, walk for 6 hours per day and 4 hours continuously, stand for 6 hours per day and 4 hours continuously, and does not need a cane to ambulate. He found that plaintiff

can frequently reach in all directions with her right arm due to a right should lipoma[2] and continuously in all directions with her left arm.  He found that she could continuously handle, finger, feel, push or pull bilaterally.  He found that she could continuously climb, balance and stoop, and that she could frequently kneel, crouch or crawl.  She had no environmental limitations as a result of her orthopedic condition.

Two hours later, at 11:00 a.m., on November 2, 2011, plaintiff underwent a psychological evaluation by Tammy Sheehan, J.D., Psy.D., a licensed psychologist, in connection with her application for disability benefits (Tr. at 337-343).  Dr. Sheehan also completed a Medical Source Statement.

> BEHAVIORAL OBSERVATIONS:  . . .  She was well-dressed in business-casual attire, which was appropriate and clean.  Grooming and hygiene were adequate; her hair was somewhat unkempt and she appeared tired and sad.  The claimant's gait was without abnormality. . . .  She was cooperative and eye contact with the examiner was good, but she was quite tearful throughout the evaluation.
>
> HISTORY:  . . .  The claimant reported that during her adulthood she worked in a variety of jobs including customer service, nursing, and telemarketing.  She stated that she was last employed in 2008 in a customer service position, but she did not make it through the training period because of mental health issues.  She said, "I felt misunderstood.  I became a crazy person." . . .
>
> The claimant's mental health history is significant.  She stated that when she was pregnant in 1978 she suffered from depression and tried to commit suicide by cutting her wrists.  In the "early 1990s" she received inpatient psychiatric treatment at Research Medical Center after taking an overdose.  In 2006 she received inpatient psychiatric treatment at Two Rivers Psychiatric Hospital after overdosing a second time. She has received follow-up psychiatric care from Swope Health Center (Dr. James True) for the last several years, and records indicate she has been diagnosed with Bipolar Disorder, Most Recent Episode Mixed, and Anxiety Disorder Not Otherwise Specified. The

---

[2]"A lipoma is a slow-growing, fatty lump that's most often situated between your skin and the underlying muscle layer. Often a lipoma is easy to identify because it moves readily with slight finger pressure. It's doughy to touch and usually not tender. You may have more than one lipoma. Lipomas can occur at any age, but they're most often detected during middle age. A lipoma isn't cancer and is usually harmless. Treatment generally isn't necessary, but if the lipoma bothers you, is painful or is growing, you may want to have it removed." http://www.mayoclinic.org/diseases-conditions/lipoma/basics/definition/con-20024646

claimant also sees a therapist at Swope as often as she is able but transportation is a problem for her. Current psychotropic medications are clonazepam (an anxiolytic), Cymbalta (an antidepressant), and trazodone (an antidepressant used as a sleep aid). . . .

MENTAL STATUS:  The claimant was oriented to person, time, place and situation. Thought processes were mildly disorganized, evidenced in some circumstantiality in her responses to questions.  Thought content was generally reality based, but she talked about feeling paranoid on occasion and often fears that people may be sneaking around her house; sometimes she goes outside in the dark to make sure no one is lurking there. The claimant acknowledged that some of her fears are based on the fact that she knew people in the past who were of a criminal element, and she has a son who served twelve years in prison. . . .  There were no clinical indications to suggest that she was experiencing perceptual disturbances during the evaluation.

The claimant's vocabulary, grammar and general fund of information suggested intellectual functioning in the average range, but mental processing was slow and mental control was poor. . .  Her fund of historic, personal-critical, and general information suggested intact memory.  The claimant possesses basic literacy and calculation skills.  Registration and recall were unimpaired.  On clinical tasks of sustained attention and concentration, her performances suggested a moderate amount of distractibility. . . .  Comprehension and reasoning were within normal limits.  The claimant is capable of abstract thinking.  No deficits were noted in basic judgment and problem solving.

The claimant's affect was very tearful throughout the evaluation. She looked extremely tired. The claimant described her mood as "confused." . . .  The claimant denied homicidal ideations but stated that she becomes so rageful at times that she is afraid she might hurt someone.

ACTIVITIES OF DAILY LIVING:  The claimant reported that she is able to meet her own needs for hygiene and nutrition.  She is able to do her own laundry, keep her own calendar and maintain appointments. . . . The claimant is able to prepare simple meals and provides some assistance to her son, who is developmentally disabled.  She is able to read and write. . . .  The claimant reported that she does not have a driver's license.  She stated that she does not ride the city bus because it is not convenient where she lives.

CONCLUSION:  . . .  Her reported symptoms and presentation are consistent with her previous diagnosis of bipolar disorder with mixed episode and some feelings of paranoia at times.  Although she is able to understand and remember simple instructions, her ability to attend and concentrate on such tasks during a normal workday on a day-to-day basis is very limited at the present time.  Because of the claimant's very low tearful mood and reported irritability with occasional paranoia, her capacity to interact appropriately with the general public and adapt to the environment is also very limited. She reported that she maintained employment over the years until 2008, but today her constant tearfulness, very low mood, and difficulties with concentration suggests that currently she would not be capable of employment on a day-to-day basis.

The claimant does have a good deal of insight into her psychological condition, and she indicates she is compliant with psychiatric and psychological treatment. Despite her compliance, however, she is not functioning well. The claimant was encouraged to call her physician (Dr. True)[3] and report the fact that she is having 48 hour periods of going without sleep even though she is taking medication. Her condition appears chronic based on her history and records. Because she has received on-going treatment for a good period of time with variable success, one might expect only minimal improvement in her condition with continued treatment. Unfortunately, the claimant's disorder may be one that is quite difficult to manage under the best of circumstances.

DIAGNOSES:

| | |
|---|---|
| Axis I: | Bipolar Disorder, Most recent Episode Mixed (By History) |

* * * * *

| | |
|---|---|
| Axis IV: | Financial stress; Lives with disabled son; Unemployed |
| Axis V: | GAF: 40 |

Dr. Sheehan found that plaintiff had no limitations in her ability to understand and remember simple instructions. She had moderate difficulty in carrying out simple instructions. She was markedly limited in her ability to make judgments on simple work-related decisions. She was extremely limited in her ability to understand and remember complex instructions, carry out complex instructions and make judgments on complex work-related decisions. "The claimant is very distractible and is <u>extremely</u> tearful. Her thinking is mildly disorganized and she reports bouts of <u>rage</u> on a daily basis."

Dr. Sheehan found that plaintiff was moderately impaired in her ability to interact appropriately with the public; markedly impaired in her ability to interact appropriately with supervisors, markedly impaired in her ability to interact appropriately with coworkers, and extremely impaired in her ability to respond appropriately to usual work situations and to changes in a routine work setting. "Based on her low mood and reported irritability and occasional paranoia, she would have a lot of difficulty interacting with others in a work setting."

---

[3]According to the records, plaintiff did not see Dr. True again for four months and on that next appointment did not mention to him that she stays up for 48 hours despite being on medication.

On December 2, 2011, plaintiff saw Maurice Flemming a physician's assistant at Swope Health, for cough and chest congestion (Tr. at 436-437). Plaintiff weighed 289 pounds. Her blood pressure was 136/89. Plaintiff had scattered wheezes throughout both lungs; however, post nebulizer treatment her lungs were clear. She was assessed with acute exacerbation of asthma and acute bronchitis. She was prescribed an antibiotic and an inhaler.

On February 3, 2012, plaintiff saw Dr. True for a medication check (Tr. at 438-439). Plaintiff arrived alone for her appointment. "[N]o sleep, worried, frets all the time; in a bad relationship that is not good for me; grew depend[ent] on him and now realized what a neurotic thing it is; so now when she is alone, she panics and then is mad at herself for falling in the trap." Dr. True noted that plaintiff was dressed appropriately, her behavior was normal, her attitude was agreeable but negative, her affect was normal, her speech was normal, memory was intact, and she was fully oriented. Insight was impaired; judgment was poor; mood was depressed, frustrated, angry. She reported situational anxiety and panic attacks. She had no suicidal ideation. She was having no medication side effects. Dr. True's diagnoses were the same as on his other medical records; he assessed a GAF of 45. He told plaintiff to continue her same medications. He prescribed Valium; told her to try "alternatives to meds and exercises such as relaxation tapes, yoga, meditation"; and "referred to therapy with C. Logan per her request." Despite assessing "anxiety state, unspecified", he completed a referral to a licensed clinical social worker due to "severe neurotic anxiety." He recommended she follow up in three months.

On February 8, 2012, the administrative hearing was held. On March 28, 2012, the ALJ found plaintiff not disabled.

The following evidence was submitted to the Appeals Council.

On March 30, 2012, plaintiff saw Otis Latimer, M.D., at Swope Health (Tr. at 456). Plaintiff reported chronic asthma her entire life. She said she had not been able to afford her medications and had been using her mother's medicine for the past two months. She had wheezing on exam. She weighed 295 pounds and her blood pressure was 145/91. She was assessed with chronic asthma and hypertension. He gave her a prescription for hydrochlorothiazide (treats hypertension) which she had been prescribed in the past, and he prescribed a steroid pill.

On May 4, 2012, plaintiff was seen at Swope Behavioral (Tr. at 454). She was tearful and emotional but denied suicidal ideation. Individual therapy and anxiety group therapy were recommended.

On July 19, 2012, plaintiff called Swope Behavioral and said she had stopped taking her medication because it was not working (Tr. at 452). She said she could not come in because she had no transportation. She was advised to find a way to come in and not to stop her medications until she could be seen by a medical professional.

On October 10, 2012, plaintiff saw Dr. True (Tr. at 449). "Wants to work on improving self esteem and set boundaries with boyfriend but not panic when he leaves; struggles with independence and neurotic need." The appointment was 10 minutes long. Dr. True assessed bipolar I disorder, anxiety state unspecified, and post traumatic stress disorder with a GAF of 45. He told her to follow up in a year.

On October 22, 2012, plaintiff participated in individual therapy with Beverly Cranmer, LCSW, at Swope Health (Tr. a 445-446). "I think those medicines are really helping me. I do have some questions for the nurse practitioner next time I see her, but I am feeling so much better. I don't feel like I'm ready to fight or ready to break into tears. I feel good." Plaintiff was observed to smile genuinely and talk with hope for the future. "She discussed an idea of

returning to school in the Spring, to a Tailoring course at Penn Valley, a two year program. She talked about her plans and what she would like to do after completing those studies. She also discussed her difficulties with getting grants and loans because she has a large school loan that she is responsible for from her son's trade school several years ago."

On November 5, 2012, plaintiff saw Florence Oni, a nurse practitioner at Swope Behavior, for a medication check (Tr. at 442-443). Plaintiff arrived alone. She was noted to be compliant with her medication and was reporting increased functionality. Her appearance was appropriate, attitude was agreeable, behavior was normal, cognitive function was intact, perception was normal, insight was intact, judgment was intact, memory was intact, thought content was logical and coherent, suicidal ideation was not present, mood was slightly depressed. "Has a live in male friend who does not get along with her son who may be released from prison soon." Ms. Oni refilled plaintiff's BuSpar (for anxiety) Vistaril (antihistamine), Amitriptyline (antidepressant used to treat insomnia), Paxil (antidepressant). She was told to stop taking Cymbalta (antidepressant).

## C.   SUMMARY OF TESTIMONY

During the February 8, 2012, hearing, plaintiff testified; orthopedic surgeon Robert Campbell Thompson, M.D., testified; neuropsychologist Richard Scott Cowles, Ph.D., testified; and Sugi Y. Komarov, a vocational expert, testified.

### 1.   Plaintiff's testimony.

At the time of the hearing plaintiff was 53 years of age (Tr. at 32). She was 5'11" tall and weighed 280 pounds (Tr. at 32). Plaintiff completed 9th grade and did not get a GED but did attend a business school where she completed a program in 1982 to become a medical secretary (Tr. at 32-33). The program was one year long (Tr. at 33). Plaintiff lied on the admission paper, indicating she had a high school diploma, and the business school admitted

her (Tr. at 33).

Plaintiff cannot work due to worsening symptoms due to her medication (Tr. at 34-35). Sometimes she does not sleep for two days even with her medication (Tr. at 34, 36). When she does not sleep, her body aches (Tr. at 34). She has pain in her neck, she has pain in a stress muscle in her back, her knees become immobile, and she loses her concentration and memory (Tr. at 34-35). Plaintiff does not know which medications cause her symptoms (Tr. at 35). It may be her depression that takes her strength and energy away -- it is like she is stuck and cannot move (Tr. at 35). Plaintiff has been on this medication for the past 15 years (Tr. at 36).

Plaintiff was hospitalized a few times due to her mental condition (Tr. at 36-37). Plaintiff testified that her last hospitalization was in the early 1990s, but then she changed her testimony and said she was hospitalized in 2006 after she took "all those pills" (Tr. at 37). She was trying to kill herself when she did that (Tr. at 37). Plaintiff sees her psychiatrist once every 3 months and she sees a therapist every 2 or 3 weeks (Tr. at 37).

Plaintiff has asthma; and when she has an onset, she cannot leave the house because she has so many triggers (Tr. at 37). She has had asthma since she was a child (Tr. at 37-38). Plaintiff cannot work with asthma because she has to stay home and use a nebulizer (Tr. at 38). Plaintiff has been to the emergency room 2 or 3 times due to her asthma (Tr. at 38). Plaintiff does not smoke (Tr. at 39).

Plaintiff has pain in her knees (Tr. at 39). She injured her right knee about 2 years ago but she believes her left knee is impaired now as well (Tr. at 39). Plaintiff takes non-steroidal anti-inflammatories and has a brace for her knee (Tr. a 40). She has not participated in physical therapy or had any surgeries or injections (Tr. at 40). When she sits, plaintiff has to raise her leg so that it is even with her waist to keep down the knee swelling (Tr. at 40). Her doctor advised her to do this (Tr. at 41). Walking hurts her knee (Tr. at 40). She can walk 1

block; she can stand for 5 minutes at a time (Tr. at 40). Plaintiff does not lift or carry anything anymore because she is afraid she will drop it or fall -- her balance is bad (Tr. at 41). She last fell a couple weeks before the hearing (Tr. at 41). Plaintiff can lift 30 pounds at the most; she can lift and carry a 10-pound bag of potatoes to the sink (Tr. at 42). Plaintiff could not lift or carry these weights continuously -- the most she could carry on a regular basis would be up to 5 pounds (Tr. at 42).

Plaintiff lives with her disabled son (Tr. at 42-43). He had brain damage when he was four, and she does some things for him (Tr. at 43). He helps her by fixing meals and doing chores around the house (Tr. at 43). He does some cooking -- plaintiff is not able to cook at all because she cannot stand on her kitchen floor (Tr. at 43). Plaintiff's house is one level and it has a basement (Tr. at 43). She does not go down to the basement because she cannot go up or down stairs (Tr. at 44).

Plaintiff is able to shop for groceries as long as someone is with her and she can use a motorized cart (Tr. at 44). Plaintiff does not drive (Tr. at 44). She stopped driving in 2006 due to paranoia, thinking someone was following her and trying to kill her (Tr. at 44). She does not take public transportation by herself because she does not feel safe (Tr. at 45). When asked why she does not feel safe, plaintiff said, "I used to be involved with some really shady people and that's the reason why." (Tr. at 45). Plaintiff has no friends with whom she socializes (Tr. at 45). She watches television and has been wanting to sew, but she cannot get herself to do it (Tr. at 45).

Plaintiff last worked in 2008 (Tr. at 34). She tried to get a job as a patient care tech but she could not do it (Tr. at 34). In 2007 plaintiff did customer service for a temporary service called GTS (Tr. at 66). She did that for about three weeks (Tr. at 66). At United Health Care she was an agent (Tr. at 66). "[I]t was a high pressure job. I had a lot of duties. It was a

prescription company and I would process refills and give patients information on their insurance coverage." (Tr. at 66). This was all done by telephone (Tr. at 66). She worked for United Health Care for 2 years, and it was a sit-down job (Tr. at 66).

In 2005 she was a patient care tech for Ruth Bronson (Tr. at 66-67). Ms. Bronson had had a stroke and was bed-ridden (Tr. at 67). Plaintiff took care of her by bathing her, cleaning her bed, bringing her meals (Tr. at 67).

Spherion was a temporary service where plaintiff worked in 2005 (Tr. at 67). She performed customer service, taking calls and processing orders from a magazine by putting information in a computer (Tr. at 67). She did that job full time for about a year (Tr. at 67). In 2005 plaintiff also did customer service for Workforce Strategies (Tr. at 68-69). In 2004 she was a technician/customer service representative taking incoming calls and helping to troubleshoot computers (Tr. at 68). She worked there for about six months (Tr. at 68). She performed customer service for Allied Staffing in 2004 and was sent to various job sites (Tr. at 68).

Plaintiff performed customer service for Accent Marketing Services, for Systematic Business Services, and for Gateway Companies (Tr. at 68-69). Those were telephone jobs (Tr. at 69). She worked in customer service for T-Mobile, Teletech, and Sprint (Tr. at 69). Plaintiff was a patient care technician for Comprehensive Mental Health (Tr. at 69). She assisted individuals who were unable to be left alone due to mental health issues or some other impairment, and she would prepare their lunch, help them with chores, and sit with them (Tr. at 69). This was a full-time job which required that she lift the patients (Tr. at 69-70).

Plaintiff had many other jobs, all in customer service (Tr. at 70). She was able to recall the names of her employers, her duties, and the approximate length of employment for a long list of jobs she held in the past (Tr. at 70-71).

22

Plaintiff was asked why she had so many jobs (Tr. at 72).

A.      I don't know.  I don't mingle very well with other people and me and the
        supervisors didn't get along or the coworkers and I just couldn't keep the job.  I
        would get fired.

Q.      Well would you have run-ins with supervisors or coworkers?

A.      With the supervisor and the coworkers, yes.

Q.      So I think the doctor mentioned something about some violent behavior in your
        record. Was that towards supervisors and coworkers?

A.      Yes.

Q.      How would that be manifested?  What would you do?

A.      I'd go off on them.

Q.      Okay. When you say go off do you mean yell, scream?  Did you become --

A.      I was threaten.

Q.      -- physical?  You threatened?

A.      Yes.  Well I felt threatened.  I felt threatened so I'd become combative and I'd
        threaten them.

Q.      And so is that the reason they would fire you?  Because [of] that?  You couldn't
        get along with anybody?

A.      Yes.

(Tr. at 72-73).

## 2.      Medical expert testimony.

Medical expert Robert Thompson, M.D., testified at the request of the Administrative

Law Judge.  The medical records establish that plaintiff has morbid obesity and degenerative

joint disease of the right knee (Tr. at 58).  There is no evidence of severe impairment of

ambulation or gross deformity, instability, or severe limitation of the motion of the right knee

(Tr. at 58).  There is no evidence of central of foraminal stenosis in plaintiff's cervical spine, and

there are no specific neurological abnormalities noted (Tr. at 59, 60).

Dr. Thompson agrees with the assessment done by Joseph Noland, M.D., with two important exceptions (Tr. at 59). Dr. Thompson would reduce the lifting and carrying to 21 to 50 pounds only occasionally, and he does not believe plaintiff should lift more than 50 pounds ever (Tr. at 59). Dr. Thompson would also restrict overhead use of both arms to occasional, because overhead use of the arms, particularly with lifting, aggravates the cervical spine arthritis (Tr. at 59-60).

Dr. Thompson's opinion is that plaintiff should never climb ladders or scaffolding due to her morbid obesity (Tr. at 61). Crawling should also be avoided due to needing to keep the head up and that aggravates the cervical spine (Tr. at 61-62). Crouching and kneeling would be occasional (Tr. at 62). Stooping could be done frequently but not continually (Tr. at 62).

Due to plaintiff's asthma, Dr. Thompson believes that she should have no exposure to dust, odors, fumes, and pulmonary irritants beyond what might be found in a normal office or retail setting (Tr. at 62-63).

Dr. Thompson does not believe there is any basis to find a limitation on the left knee and noted that the consultative report probably contains a mistype when it states that plaintiff's symptoms are worse on her left knee than her right because all of the medical evidence pertains to her right knee (Tr. at 63).

3.     **Psychological expert testimony.**

Medical expert Richard Cowles, Ph.D., testified at the request of the Administrative Law Judge. The earliest notation in the medical records dealing with any mental symptoms was October 16, 2008, when mild anxiety and depression were observed and plaintiff was diagnosed with major depressive disorder, recurrent, severe (Tr. at 47). She was first diagnosed with bipolar I disorder on February 9, 2009 (Tr. at 47). Those records indicate that plaintiff reported a suicide attempt in April 2006; however, there are no medical records related to the

24

alleged suicide attempt (Tr. at 47). In March 2010 plaintiff was supposed to be taking

Diazepam but indicated she was not taking it due to a fear of addiction (Tr. at 47-48). Dr.

Cowles noted that plaintiff was listed as being irritated, depressed, anxious and having suicidal

ideation; however, the records from March 2010 specifically deny suicidal ideation. On

October 25, 2011, she saw Dr. Sheehan and reported a suicide attempt in 1978 while she was

pregnant (Tr. at 48). She said that she cut her wrists, but again there are no medical records

substantiating this (Tr. at 48). She said she tried to overdose in the 1990s, but there are no

medical records for this (Tr. at 48). She reported a suicide attempt and inpatient treatment in

2006, but there are no medical records for that (Tr. at 48). The records show that she quit

using crack cocaine in 1994 (Tr. at 48). The records indicate that plaintiff reported feeling

better when she participates in therapy, and that she does pretty well on medication but had

run out of her medication (Tr. at 49).

In all of plaintiff's medical records, there appear two mental diagnoses: bipolar I

disorder and anxiety not otherwise specified (Tr. at 50). There are no records of her being

hospitalized (Tr. at 50). Her participation in therapy has not been consistent (Tr. at 50).

Plaintiff's diagnosis of bipolar I disorder is consistently throughout the records (Tr. at

51). Dr. Cowles found it unusual that plaintiff has not been prescribed a mood stabilizer which

is a typical form of treatment for bipolar I disorder (Tr. at 51). Cymbalta is an antidepressant,

Klonopin is for anxiety, Valium is for anxiety (Tr. at 54). Anticonvulsants are typically used as

mood stabilizers, examples of which are Depakote or Lithium (Tr. at 54).

With regard to plaintiff's records showing low GAF scores, Dr. Cowles testified as

follows:

> The GAF scores in this case don't appear to match up well with the description. For
> instance, in 11-F on page 13 we have this mini mental status exam in the normal range.
> They're also reporting, on page 5, that she's feeling better, doing well in therapy and yet
> they give her a GAF score of 42, on page 15.

I think it's not unusual in records for the GAF scores to not be consistent with the overall description, objective evidence, and part of that is probably simply bad record keeping. Once there's a score on the record sometimes they tend to repeat it without reassessing. And they do not make clear that this is the standing score they've been using for a while rather than degrade it individually each time.

The other issue there is, for the sake of insurance reimbursement a certain score is required on the GAF scale so a lot of times facilities will simply give the score that's necessary to get services for a client. And it may not be as accurate as their more elaborated descriptions of what's happening. And I felt that was what was happening in these records. The scores were so low I was concerned and double checked the written descriptions and they just did not express the same severity as those GAF scores.

* * * * *

With the GAF scores you have to give a certain score, below a certain number, in order for insurance to reimburse and in order for someone's problems to be considered serious enough for them to get treatment. So lots of times treating facilities will establish that number based on what they need to treat someone without actually looking at individual day-to-day how someone is doing. . . .

I certainly see it frequently. I don't want to say it's a common practice but I've seen it in many records where when the score doesn't make sense I think it's often because it was done on an administrative level and not necessarily by the clinician. . . .

(Tr. at 52-53, 56).

Plaintiff's activities of daily living are only mildly affected (Tr. at 50). Her social functioning, based on the risk assessment in the record, her paranoia, and her mood disturbance, seems to be markedly affected (Tr. at 50). Her anxiety problems are not well documented in the record (Tr. at 50). She has normal concentration in one place and very limited concentration in another (Tr. at 50). "There's just not enough development for any conclusion beyond moderate effects on concentration, persistence, pace." (Tr. at 50). Based on these findings, plaintiff is limited to simple or unskilled work only and she should have only minimal contact with the public and coworkers (Tr. at 51).

4.    **Vocational expert testimony.**

Vocational expert Sugi Komarov testified at the request of the Administrative Law Judge.

Plaintiff's past relevant work includes order clerk, also known as customer service representative, which is semi-skilled with an SVP of 4, sedentary; hand packager, unskilled with an SVP of 2, medium; home-health aid, semi-skilled with an SVP of 2, medium; and customer complaint clerk, skilled with an SVP of 5, sedentary (Tr. at 74).

The first hypothetical involved a person who could lift and carry up to 50 pounds occasionally and 25 pounds frequently, could sit without limitation, could stand and walk for 6 hours per day, could occasionally reach overhead, and should avoid looking above the horizon (Tr. at 75). The person should avoid climbing ladders, scaffolds and ropes; avoid crawling (Tr. at 75). The person could occasionally crouch, kneel, stoop, and climb ramps and stairs (Tr. at 75). The person should avoid exposure to dust, gases, fumes, odors, and poor ventilation beyond what would be present in a retail or office setting (Tr. at 75). The person should avoid unprotected heights, dangerous machinery, vibration, and cold temperatures (Tr. at 75). The person can perform simple, unskilled work; needs only minimal contact with the public and coworkers, i.e., someone who can come and go without much interaction with others (Tr. at 75-76). Such a person could not perform any of plaintiff's past relevant work (Tr. at 76). However, the person could work as a mail room clerk, DOT 209.687-026, light, unskilled with an SVP of 2, with 1,800 in Missouri and 90,000 in the country; a parking lot attendant, DOT 915.73-010, light unskilled with an SVP of 2, with 550 jobs in Missouri and 50,000 in the country (the original numbers were reduced by half due to the cold weather restriction); sewing machine operator, DOT 786.685-030, light, unskilled with an SVP of 2, with 1,200 in Missouri and 120,000 in the country; or photocopy machine operator, DOT 207.685-014, light, unskilled with an SVP of 2, with 900 in Missouri and 60,000 in the country (Tr. at 76-77).

The second hypothetical was the same as the first except the person has marked

limitations in the ability to make judgments on simple work-related decisions and in interacting

appropriately with supervisors and coworkers; an extreme limitation in the ability to respond

appropriately to usual work situations and to changes in a routine work setting (Tr. at 79).

Such a person could perform no work (Tr. at 79).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Jack McCarthy entered his opinion on March 28, 2012 (Tr. at

10-24).  The ALJ first pointed out that plaintiff has filed 7 applications for supplemental security

income under Title XVI and 5 applications under Title II (Tr. at 13).  Her first application was

filed on October 15, 1985, and alleged an onset of October 9, 1978.  That claim was denied on

February 6, 1986.  Her second application was filed on June 13, 1995, alleging an onset date of

September 5, 1985 (Tr. at 13).  That claim was denied by an ALJ on December 26, 1996 (Tr. at

13).  The third application was filed August 7, 2002, alleging an onset date of October 1, 2002

(Tr. at 13).  The claim was denied on June 11, 2003 (Tr. at 13).  She filed her fourth application

on June 15, 2004, alleging an onset date of July 1, 2002 (Tr. at 13).  That claim was denied on

October 29, 2004 (Tr. at 13).  The fifth application was filed on August 1, 2006, alleging an

onset date of June 15, 2006 (Tr. at 13). The claim was denied on September 16, 2006 (Tr. at

13).  The sixth application was filed on June 13, 2008, alleging an onset date of May 1, 2008

(Tr. at 14).  That claim was denied by an ALJ on February 8, 2010 (Tr. at 14).  The alleged onset

date in the current application is February 9, 2010, which is the day after the prior unfavorable

decision by an administrative law judge (Tr. at 14).  Plaintiff's last insured date was September

30, 2013 (Tr. at 14).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset

date (Tr. at 14).  She worked after this date; however, the work did not rise to the level of

substantial gainful activity (Tr. at 14).

Step two.  Plaintiff suffers from the following severe impairments:  degenerative joint disease of the right knee, morbid obesity, degenerative disc disease of the cervical spine, asthma, and bipolar I disorder (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17-18).

Step four.  Plaintiff retains the residual functional capacity to perform medium work. She can lift and carry up to 50 pounds occasionally and 25 pound frequently; stand and walk 6 hours per day; sit without limitation; reach overhead occasionally; look above the horizon occasionally.  She should avoid crawling and climbing ladders, ropes and scaffolds. She is limited to occasional stooping, crouch, kneeling and climbing stairs or ramps.  She should avoid exposure to dust, gases, fumes, odors and poor ventilation beyond what would be present in a retail or office setting.  She should avoid unprotected heights, dangerous machinery, vibration and cold temperatures.  She is able to perform simple, unskilled work but is limited to minimal contact with the public and co-workers (Tr. at 17).  With this residual functional capacity, plaintiff is unable to perform any past relevant work (Tr. at 22).

Step five.  Plaintiff is capable of performing other work available in significant numbers in the economy such as mail room clerk, photocopy machine operator, and sewing machine operator (Tr. at 23).  Therefore, plaintiff is not disabled (Tr. at 23-24).

## VI.    *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen,

830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The ALJ had this to say about plaintiff's prior work record:

The claimant filed applications for disability benefits in 1985, 1995, 2002, 2004, 2006, 2008, and 2010. However, the claimant performed substantial gainful activity in at

least 1998 through 2006.  The claimant's credibility is seriously compromised by her
work activity during multiple periods when she alleges that she was disabled.

(Tr. at 19).  Although plaintiff argues that she has had more than 40 jobs in her life, the

evidence establishes that during the past almost 30 years, plaintiff has been attempting to get

disability benefits, alleging an onset date as early as 1978.  During the entire length of at least

three of those disability applications, plaintiff performed substantial gainful activity every year.

Working with impairments coupled with a lack of evidence that the impairments have

worsened, demonstrates that the impairments are not disabling in the present.  Goff v. Barnhart,

421 F.3ed 785, 792 (8th Cir. 2005).  Plaintiff's medical records contain statements by her that

she has suffered with asthma her entire life; she has suffered with depression her entire life; she

suffered with knee pain for years.

The duration, frequency and intensity of symptoms also supports the ALJ's findings.  A

disability determinations counselor observed that plaintiff had no difficulty understanding,

concentrating, talking, answering, sitting, standing, walking, or coherency.  In a function

report, plaintiff said that if spoken instructions are plain and simple she can follow them

without redirection, which is consistent with the ALJ's residual functional capacity assessment.

On April 27, 2009, plaintiff described her pain a 7 out of 10 in severity, yet she was prescribed

no pain medication on that visit.  Instead she was told to diet and exercise.   on March 16, 2010,

plaintiff was in the emergency room and denied back pain, denied difficulty walking.  On

another occasion, Milton Levin, M.D., noted that plaintiff's gait was normal.  Joseph Noland,

M.D., noted that plaintiff's gait was normal, stable, and non-antalgic.  Tammy Sheehan, Ph.D.,

observed that plaintiff's gait was normal.  This is inconsistent with plaintiff's hearing testimony

during which she described frequent falls.

Precipitating and aggravating factors are in large part unrelated to plaintiff's

impairments.  Dr. True noted that plaintiff was looking for a job but was unable to find one

because jobs were "tight now." In addition, she was in a relationship with a man who expected her to work and take care of things around the house without any help from him. On February 9, 2010, plaintiff complained that she could not sleep but she had not been taking the sleeping medication that had been prescribed. On May 7, 2010, she complained that she was not sleeping because she was under too much stress due to being in a relationship that had spun out of control and having too many bills with not enough money. On February 3, 2012, she complained of not being able to sleep due to her constant worry about being in a bad relationship. On March 16, 2010, she suffered an exacerbation of her asthma due to acute bronchitis. On July 9, 2010, she had an exacerbation of asthma due to not taking her Albuterol. On December 2, 2011, her asthma was exacerbated due to acute bronchitis. On August 9, 2011, she had elevated blood pressure due to being out of her medications for the last week.

The record establishes that plaintiff's medications were kept fairly consistent, and she had no side effects from her medication. Plaintiff testified that she cannot work due to symptoms caused by her medications. However, no adverse effects from medication were reported anywhere in the medical records. In fact, plaintiff specifically denied medication side effects on February 9, 2010; August 9, 2010; and February 3 2012. On October 22, 2012, she is quoted as saying, "I think those medicines are really helping me. . . . I am feeling so much better. I don't feel like I'm ready to fight or ready to break into tears. I feel good."

No doctor ever put any functional restrictions on plaintiff. Plaintiff testified that her doctor advised her to elevate her leg when sitting; however, the medical records do not reflect this and show very conservative treatment for her knee. Furthermore, there are multiple references in the record to recommendations that plaintiff exercise.

In addition to the factors discussed above, I note that in a function report plaintiff said she completed 12th grade in 1980 but has no specialized job training, trade school or

vocational school. She testified at the hearing that she did not graduate from high school or get a GED but she lied on her application for business school and completed a medical secretary program in 1982.

Plaintiff testified that she falls, and that she last fell a week before the hearing, which would have been approximately February 1, 2012. She saw Dr. True on February 3, 2012, but did not report having fallen. Her next medical appointment was on March 30, 2012, with Dr. Latimer, and she did not indicate she had ever fallen.

Plaintiff testified that she does not use public transportation because she does not feel safe; however, she told Dr. Sheehan that she does not use public transportation because it is not convenient.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision regarding plaintiff's credibility.

## VII.    RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because he improperly gave more weight to a non-examining mental health professional than a non-treating examining mental health professional.

A claimant's residual functional capacity is the most he can do despite the combined effect of his credible limitations. 20 C.F.R. §§ 404.1545 and 416.945. The claimant bears the burden of proving his residual functional capacity, and it is the ALJ's responsibility to determine the residual functional capacity based on all of the relevant evidence in the record, including medical opinions and the claimant's credible statements about his limitations. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ is required to determine which alleged symptoms are supported by medical evidence in the record. 20 C.F.R. §§ 404.1529 and 416.929 ("In determining whether you are

disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.")

Plaintiff argues that the ALJ erred in giving greater weight to the opinion of Dr. Cowles, who testified as an expert at the hearing but did not examine plaintiff, than to the opinion of Dr. Sheehan, who examined plaintiff on one occasion in connection with her disability case. According to the testimony of the vocational expert, the relevant portion of Dr. Sheehan's findings include the following limitations: a marked limitation in the ability to make judgments on simple work-related decisions and in interacting appropriately with supervisors and coworkers, and an extreme limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting.

Dr. Sheehan saw plaintiff at 11:00 a.m. on the same day that she was examined by Dr. Noland (an orthopedic doctor) at 9:00 a.m. Although Dr. Sheehan observed that plaintiff was "quite tearful" during her mental evaluation, there was no observation of any tears during her orthopedic evaluation shortly before. Additionally, Dr. Sheehan's recommendations explicitly rely on plaintiff's allegations, which are not entirely credible. "Because of the claimant's very low tearful mood and **reported** irritability with occasional paranoia, her capacity to . . . adapt to the environment is also very limited." Plaintiff **reported** bouts of rage on a daily basis; however, plaintiff never displayed rage to anyone while at any appointment during the four years covered by the medical records. "Based on her low mood and **reported** irritability and occasional paranoia, she would have a lot of difficulty interacting with others in a work setting." I note here that the ALJ did indeed limit plaintiff's interaction with others in the residual functional capacity assessment.

In addition to relying in large part on plaintiff's subjective reports, Dr. Sheehan's opinion is inconsistent with plaintiff's treatment records. On August 9, 2011, plaintiff was seen by Jennifer Santiago, a nurse practitioner, who observed that plaintiff was pleasant. On November 5, 2012, Florence Oni, a nurse practitioner, observed that plaintiff's appearance was appropriate, attitude was agreeable, behavior was normal, cognitive function was intact, perception was normal, insight was intact, judgment was intact, memory was intact, thought content was logical and coherent, and mood was slightly depressed over a live-in male friend not getting along with her son.

Dr. True, plaintiff's treating psychiatrist, noted on October 16, 2008, that plaintiff was only mildly anxious. On July 20, 2009, he observed that she was well groomed, pleasant, with goal directed speech. She was euthymic and calm. On December 14, 2009, plaintiff reported that she was awaiting her disability hearing, she said she was so anxious and depressed that she cannot work. Dr. True noted only depression and anxiety in his assessment which mirrors plaintiff's subjective complaints. On January 21, 2010, Dr. True observed that plaintiff was weeping, she admitted that she never got a degree and was too depressed to work. He observed that she was depressed and anxious. On February 9, 2010, plaintiff said she was irritated, depressed and anxious -- she had just learned her disability application had been denied by an ALJ. On May 7, 2010, Dr. True noted no delusion, normal speech. He noted her to be depressed and slightly anxious. On August 9, 2010, Dr. True observed that plaintiff was friendly with goal-directed speech, a bright affect, she was properly groomed and "almost euthymic." On December 27, 2010, Dr. True observed that plaintiff was pleasant with a depressed mood and avoidant style/affect.

On May 23, 2011, Dr. True noted that plaintiff was crying while talking about having no money, living off her son, and having no car. This was the only time during 2011 that

plaintiff sought treatment for her mental health.

On February 3, 2012, Dr. True observed that plaintiff was dressed appropriately, her behavior was normal, her attitude was agreeable but negative, her affect was normal, her speech was normal, her memory was intact, she was fully oriented. Her insight was impaired, judgment poor, and her mood was depressed, frustrated and angry. Her administrative hearing in this case was scheduled for five days later. Also on that February 3, 2012, appointment, Dr. True assessed "anxiety state, unspecified," but filled out a referral form for a social worker and stated the reason as "severe neurotic anxiety," which supports the opinion of Dr. Cowles during the hearing that notations on medical records for insurance approval or other non-treatment related reasons will sometimes be exaggerated.

Dr. Sheehan's opinion is also inconsistent with the opinion of other medical professionals who reviewed her records. Dr. Bucklew found mild difficulties in activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. "Based on the evidence as a whole, claimant may have problems at times performing more demanding tasks, and she would be limited for socially stressful or complex tasks, but she is otherwise able to remember, understand, and complete instructions with usual supervision." Dr. Cowles found that plaintiff should be limited to simple or unskilled work only and she should have only minimal contact with the public and coworkers.

Finally I note that plaintiff was not always compliant with medication and therapy. When she took her medication as directed, she reported that she was sleeping well, she had increased functionality, and she reported feeling "good."

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VIII. CONCLUSIONS

Plaintiff's final argument, that the ALJ relied on in improper hypothetical, is without merit as it relies on the above arguments.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 14, 2014